IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

K.K.

        Plaintiff,                           12cv1603
                                              **ELECTRONICALLY FILED**

        v.

PITTSBURGH CITY SCHOOLS,

        Defendant.

## MEMORANDUM OF LAW RE: PARTIES' CROSS-MOTIONS FOR SUMMARY JUDGMENT (DOC. NOS. 28 AND 30)

*I.     Introduction*

This case centers on alleged disability-based discrimination by the Pittsburgh City Schools against a former student of the Center for Advanced Studies ("CAS") at Allderdice High School. Doc. No. 1. Plaintiff ("K.K."), in her two Count Complaint, has alleged substantive and procedural violations of Section 504 of the Rehabilitation Act of 1973 ("Section 504"). Doc. No. 1, 17-19. Presently before this Court are Cross-Motions for Summary Judgment filed by Plaintiff and Defendant Pittsburgh City Schools ("School District"). Doc. Nos. 28 and 30.

*II.     Statement of Facts*

K.K. is a 2010 graduate of the School District of Pittsburgh. Doc. No. 41, ¶ D1. K.K. was born on January 22, 1992, and is twenty-one (21) years old. Id. at ¶ D2. She attended Allderdice High School and participated in the school's CAS gifted program, which included a rigorous academic course load. Id. at ¶¶ D6-7, P2.

K.K. experienced severe vomiting and flu symptoms in the spring of her Junior year (2009). Id. at ¶ D8. She was diagnosed with gastroparesis. Id. at ¶ P3. She was hospitalized

intermittently and missed school as a result. Id. at ¶ D10. The School District provided homebound instruction to K.K. during the spring of her Junior year and through the rest of that school year. Id. at ¶ D11, P4. Homebound instruction was provided by Mr. Hai Le, who continued to work with K.K. as her privately paid private tutor throughout the summer. Id. at ¶¶ D12-13. With this help, K.K. completed her 11th grade coursework except for a Chemistry course and a Japanese 3 course. Id. at ¶¶ D14, P4, P9.

K.K. began her Senior year generally symptom-free. Id. at ¶ D15. K.K.'s senior year course load was "unusually" rigorous, included several non-mandatory courses, and did not afford her a lunch period. Id. at ¶¶ D17-18. K.K.'s CAS advisor and her academic counselor met with K.K. and her parents to express concern over the weight of her academic schedule given the unusual rigor and the two incomplete courses from 11th grade. Id. at ¶ D19. K.K. dropped two courses and dropped Calculus BC in favor of a less rigorous Calculus AB. Id. at ¶¶ D20-21.

In early 2009, K.K.'s parents informed the high school that her symptoms had returned. Id. at ¶ D22. K.K.'s parents were initially hopeful that K.K.'s illness would be temporary. Id. at ¶ D23. On several occasions, the School District suggested that her parents apply for homebound instruction for K.K.. Id. at ¶ D24. K.K.'s parents and school personnel met on October 28, 2009, to discuss K.K.'s recent absences and services available to help her meet her academic needs. Id. at ¶ D25. The high school offered school-based Student Assistance Program ("SAP") services which could have included mental health services or basic counseling. Id. at ¶ D26. The parents declined due to K.K.'s private counseling. Id. at ¶ D27. The school recommended that K.K. begin homebound instruction again. Id. at ¶ D28. Homebound instruction was approved for K.K. beginning on November 3, 2009. Id. at ¶ D29. K.K.'s parents

requested Mr. Le, but he was unavailable due to his full schedule. Id. at ¶ D30. Allderdice teacher Kathy Hoelzle was assigned as K.K.'s homebound instructor. Id.

K.K. was found eligible as a qualified student with a disability protected under Section 504 and Chapter 15 on November 10, 2009. Id. at ¶ D32. A 504 team was formed that considered information from K.K.'s pediatrician and gastroenterologist to formulate appropriate Section 504 plan accommodations. Id. at ¶ D33. K.K.'s parents requested several accommodations be considered for the 504 plan including more than two and a half hours of homebound instruction per week and a single point of contact for coordinating her 504 services and monitoring her academic progress. Id. at ¶ P11. K.K.'s pediatrician advised that "[a] strict homebound schedule will not promote [K.K.'s] well-being and is not in her best interest." Id. at ¶ D36. The November 10, 2009, plan included the following: (1) K.K. was to received homebound instruction through December 1st with renewals as necessary; (2) K.K. would be given the option to attend school when her health permitted her to do so, and would notify the school counselor if/when she planned to be in attendance; (3) 50% extended time on assignments; and (4) access to the nurse's office or the CAS office in the event of a medical emergency. Id. at ¶¶ D34, P14. K.K.'s teachers were provided with the plan on November 13, 2009. Id. at ¶ D35. K.K.'s parents signed the plan on November 17, 2009, and requested an conference to discuss concerns, which the School District thought centered on the details of homebound instruction. Id. at ¶¶ D37-38, P15.

K.K. participated in the plan's modified homebound schedule, which permitted her to attend school when her health permitted. Id. at ¶ D40. She spent much of the time between November 10, 2009 and the end of January 2010 absent from school. Id. By mid-November, the

School District learned that K.K.'s parents had retained legal counsel and the School District then involved its own legal counsel. Id. at ¶ D39.

Ms. Hoelzle instructed K.K. until the first week of December when she communicated to K.K.'s Parents and the School District that she would not be able to provide further homebound instruction. Id. at ¶¶ D41, P18. Mr. Le was instructed by a District Assistant Superintendent to begin instructing K.K. on December 11, 2009. Id. at ¶ D43. Mr. Le was qualified to provide direct instruction in Calculus, English, and History. Id. at ¶¶ D47, P25. He primarily facilitated work for K.K. in Physics, Chinese 4, and Japanese 4. Id at ¶ D47.

The School District customarily provides 2.5 hours of homebound instruction per week for students who are temporarily unable to attend school. Id. at ¶ D46. This procedure was communicated to K.K.'s parents. Id.

On December 14, 2009, District legal counsel received correspondence that K.K. had been diagnosed with Adjustment Disorder with Mixed Anxiety and Depressed Mood. Id. at ¶ D50, P25. The School District then issued a Permission to Evaluate for eligibility under the Individuals with Disabilities Education Act to K.K.'s Parents. Id. at ¶ D52. Permission was not granted. Id. As of mid-December 2009, K.K. and her parents firmly believed that K.K.'s teachers demonstrated professionalism and a high level of commitment to her education. Id. at ¶ D53.

On January 13, 2010, K.K.'s 504 team, with counsel for both parties and the high school's Social Worker present, reconvened to revise her accommodation plan. Id. at ¶¶ D54, P28. The January 13, 2010, 504 plan revision included the following: (1) homebound instruction through the end of January 2010 to allow for transition back to the school environment; (2) modification of the School District's attendance policy so that K.K. was not penalized for

medical absences; (3) permission to eat and drink throughout the school day; (d) permission to enter and exit the school building as needed, with the requirement that K.K. sign in and out at the school's front door; (e) K.K. was not required to attend homeroom, but would rather proceed directly to her first period class; (f) modification of K.K.'s schedule to allow for free periods and one class period of direct instruction per week in English, Calculus, Japanese, Chinese, and Physics; (g) assignment to her Physics' instructor's study hall; (h) the school principal or designee would assist teachers in providing make-up work that is not duplicative; (i) K.K. would not be penalized on tests or assignments regarding information or concepts not previously taught; (j) in the case of a medical relapse, the School District would assign a single point of contact for K.K. and this individual would be responsible for: coordinating makeup assignments; collecting study guides, lesson plans and notes for current classes; corresponding with K.K.'s parents to ensure continued progress with coursework; and coordinating homebound services; and (k) access to the nurse's office or the CAS office in the case of a medical emergency. Id. at ¶¶ D55, P29. K.K.'s academic counselor, Nancy Wallach was responsible for monitoring the revised 504 plan. Id. at ¶¶ D69, P28. The plan included a date for review or reassessment of March 30, 2010. Id. at ¶ 30.

K.K's concerns with anxiety were also discussed, including a discussion of support available that could assist K.K.. Id. at ¶¶ D56-58. K.K. met with the School Social Worker one time to discuss stress and anxiety. Id. at ¶ D58. K.K. and her parents did not complete release forms which were provided to them that would have enabled the School District to communicate with K.K.'s private therapist. Id. at ¶ D59.

The Allderdice Principal devised a weekly schedule including K.K.'s direct instruction periods and met with teachers to communicate the terms of the revised 504 plan. Id. at ¶ D60.

Each teacher agreed to meet with K.K. and provide direct instruction during their preparation period. Id. at ¶ D61. K.K.'s outstanding first semester coursework was collected by the Principal and hand delivered to her home. Id. at ¶ D62.

As of January 22, 2010, K.K. was symptom free and she received a good report from her psychologist. Id. at ¶ D63. An update was sent to the Coordinator of Health Services in the District's Central Office and Mr. Le. Id. at ¶ D64. K.K. ended homebound instruction on January 29, 2010, and she returned to school full time in early February 2010. Id. at ¶¶ D65-66.

On her first day back at school, K.K. learned that her physics teacher expected her to immediately take the previous semester's final. Id. at ¶ P31. K.K. became overwhelmed with the amount of work she had to make up and her demanding school schedule and sought refuge in the school library. Id. at ¶¶ D72, P34. K.K. told the library attendant that she was a partial homebound student and did not need to attend classes. Id. at ¶ D73. K.K. was repeatedly absent from February through June 2010. Id. at ¶ D74. Her teachers permitted her to come and go according to her wishes in class and direct instruction sessions. Id. at ¶ D76. When she was absent, her teachers believed that it was because of her medical condition. Id. at ¶ D77.

During K.K.'s senior year the following accommodations were made: (1) teachers reduced the coursework K.K. was expected to complete compared with her nondisabled peers; (2) K.K. was permitted to use notes and study guides on closed-book exams; (3) K.K. was permitted to take selected English exams orally rather than in written format; (4) K.K. received extensions on assignments; (5) K.K.'s English exam was graded without a late penalty even though school had been recessed for several weeks; and (6) K.K.'s attorney was able to review and edit draft college admission letters sent by the School District on K.K.'s behalf and review

6

her final transcript before it was sent, which other students were not permitted to do. Id. at ¶¶ D87-92, 100-101.

On April 6, 2010, the School District's counsel communicated to counsel for K.K.'s parents that it had concerns about K.K.'s class absences. Id. at ¶ D78. On April 21, 2010, a meeting was convened by K.K.'s parents with her 504 team. Id. at ¶ P34. K.K. admitted to her parents and to her English and Calculus teachers that she was retreating to the library when she was not in class or a one-on-one direct instruction. Id. at ¶ D79.

In May 2010, K.K.'s parents and school staff learned that K.K. was retreating to the library for all of her classes. Id. at ¶ D82. At the end of the month, the School District was informed by K.K.'s legal counsel that K.K. had experienced a medical relapse and was unable to attend class. Id. at ¶ D83. As a result, the School District implemented provisions of the January 504 plan including appointment of a school contact person and providing an application for homebound services. Id. at ¶ D84. K.K.'s chemistry teacher offered to privately instruct K.K. to lessen her anxiety. Id. at ¶ D85. K.K. attended one of the two scheduled sessions. Id.

K.K. completed the academic year at home with the assistance of private tutors. Id. at ¶ D86. K.K. and her parents elected not to proceed with homebound instruction. Id. K.K. had 36 unexcused and 39 excused absences during her senior year. Id. at ¶ D102. Under the School District's absence policy, these absences could have resulted in K.K. failing all of her classes. Id. at ¶ D103. K.K. was not penalized. Id. K.K. was ranked 21st in her graduating class of 336 students. Id. at ¶ D95. K.K. was accepted to and matriculated into John Hopkins University in the fall of 2010. Id. at ¶ D104.

On November 21, 2011, K.K.'s parents filed an administrative due process complaint with the Pennsylvania Office for Dispute Resolution ("ODR"). Id. at ¶ D106. K.K.'s parents

alleged that K.K. had been discriminated against with deliberate indifference in violation of Section 504. Id. at ¶ D107. The Special Education Hearing Officer issued a decision in favor of the District. Id. at ¶¶ D109-110. K.K. and her parents appealed this decision by filing the present case before this Court. Id. at ¶ D111.

### III. Standard of Review

Summary judgment may be granted if, drawing all inferences in favor of the non-moving party, "the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a).

A fact is "material" if proof of its existence or non-existence might affect the outcome of the suit under applicable law. *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 248, (1986). "Facts that could alter the outcome are material facts." *Charlton v. Paramus Bd. of Educ.*, 25 F.3d 194, 197 (3d Cir.1994). Disputes must be both (1) material, meaning concerning facts that will affect the outcome of the issue under substantive law, and (2) genuine, meaning the evidence must be such that a reasonable jury could return a verdict for the nonmoving party. *Anderson*, 477 U.S. at 248.

A party moving for summary judgment has the initial burden of supporting its assertion that fact(s) cannot be genuinely disputed by citing to particular parts of materials in the record – i.e., depositions, documents, affidavits, stipulations, or other materials – or by showing that: (1) the materials cited by the non-moving party do not establish the presence of a genuine dispute, or (2) that the non-moving party cannot produce admissible evidence to support its fact(s). Fed.R.Civ.P. 56(c)(1).

Conversely, in order to defeat a motion for summary judgment, the non-moving party must support its assertion that fact(s) are genuinely disputed by citing to particular parts of

materials in the record, or by showing that: (1) the materials cited by the moving party do not establish the absence of a genuine dispute, or (2) the moving party cannot produce admissible evidence to support its fact(s). Id.

In reviewing a motion for summary judgment, the Court "does not make credibility determinations and must view facts and inferences in the light most favorable to the party opposing the motion." *Siegel Transfer, Inc. v. Carrier Express, Inc.*, 54 F.3d 1125, 1127 (3d Cir.1995).

*IV. Discussion*

Plaintiff's Complaint contains the following causes of action: (1) procedural violations of Section 504, and (2) substantive violations of Section 504. Doc. No. 1.

Section 504 provides that "[n]o otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance[.]" 29 U.S.C. § 794(a). To prevail on a claim under Section 504 in a public school context, a plaintiff must show that he or she: "(1) has a disability; (2) was otherwise qualified to participate in a school program; and (3) was denied the benefits of the program or was otherwise subject to discrimination because of [his or her] disability." *Chambers ex rel. Chambers v. Sch. Dist. of Phila. Bd. of Educ.*, 587 F.3d 176, 189 (3d Cir. 2009). The parties only dispute whether the third element is satisfied. *Id.* Additionally, Defendant contends that there is no evidence in the record establishing the necessary causation element to prove that Plaintiff is entitled to damages. Doc. No. 32 at 8–11.

Where a plaintiff seeks compensatory damages under Section 504, he or she must show intentional discrimination on the part of the defendant rising to a level of "deliberate

9

indifference." *S.H. ex rel Durrell v. Lower Merion School District*, --- F.3d ---, slip op. at 31–32 (Sept. 5, 2013). In order to meet this standard, Plaintiff must show that the School District: (1) knew that a federally protected right was substantially likely to be violated, and (2) failed to act despite that knowledge. *Id.* at *36 (citing *Duvall v. Cnty. of Kitsap*, 260 F.3d 1124, 1139 (9th Cir. 2001)). Plaintiff is not required to show that Defendant had "personal ill will or animosity toward" Plaintiff, but still must show that the discrimination resulted from a "deliberate choice, rather than negligence or bureaucratic inaction." *Id.* at *30 (internal quotations omitted).

Plaintiff cites to several alleged failures in K.K.'s 504 plans and their implementation to support her contention that Defendant acted with deliberate indifference which, in essence, center on: insufficient amounts of weekly homebound instruction; issues with obtaining a homebound instructor who was qualified to assist K.K. with her rigorous course load; failure to hold requested meetings with K.K.'s parents or hold follow-up review of 504 plans; and failing to supervise and properly implement K.K.'s 504 plans. Doc. No. 41. The Court must determine if these facts would create "an inference that the school district acted with deliberate indifference toward [K.K.] because of her disability." *Chambers v. Sch. Dist. of Philadelphia Bd. of Educ.*, 827 F.Supp. 2d 409, 426 (E.D. Pa. 2011). Both parties concede that Plaintiff must demonstrate that the School District's conduct was more than negligent and involved an element of deliberateness. *Chambers*, 827 F.Supp.2d at 426, Doc. No. 29, 6, Doc. No. 43, 4.

The material facts of this case do not demonstrate that the School District acted with deliberate indifference towards K.K.. When viewed in the light most favorable to Plaintiff, the facts may reflect an imperfect approach to a student that struggled to finish her high school career because of health problems. However, evidence has not been presented to support an inference that the School District had knowledge that K.K.'s federally protected rights were

substantially likely to be violated and they failed to act. Although evidence arguably has been presented that the School District may not have sufficiently supervised K.K.'s 504 plan or responded to every one of K.K.'s parents' concerns, unlike *Chambers v. Sch. Dist. of Philadelphia Bd. of Educ.*, - - - Fed. Appx. - - - - 2013 WL 5225182, * 4-5 (3d Cir. Sept. 17, 2013), there is no evidence of "serious and repeated" failures on the School District's part. At most, Plaintiff has demonstrated an imperfect plan imperfectly implemented. There is no evidence that School District was on notice that K.K.'s rights were ever in jeopardy.

Despite Plaintiff's contentions otherwise, there is no evidence that Defendant "intentionally refused to take any remedial or corrective action to remedy the problem." *Scaggs v. New York Dept. of Educ.*, 2007 WL 1456221, at * 16 (E.D.N.Y. 2007)(cited by Plaintiff, Doc. No. 29, 7). Isolated failures to respond promptly to parental concerns, hold a follow-up meeting, etc., are not more than negligence. The evidence as a whole demonstrates that the School District considered K.K.'s and her parents' concerns in formulating plans along with that of professionals involved (K.K.'s physicians, the school social worker, etc.). This Court in no way seeks to minimize the stress K.K. and her parents undoubtedly experienced. However, like all human beings, school counselors, administrators, and other education professionals are not infallible.

The School District took reasonable actions to assist K.K., some of which were not accepted by K.K. or her parents, which negates the alleged deficiencies of its overall course of action. Indeed, rather than continuing with the original 504 plan, the School District, after meeting with various involved parties, modified K.K.'s 504 plan to attempt to assist her. This Court's role is not to determine what should or could have been done better, but only to determine if Plaintiff has presented sufficient evidence to demonstrate the School District's

deliberate indifference. When the totality of the School District's conduct is reviewed, even accepting the deficiencies alleged by Plaintiff, Plaintiff has failed to establish a violation of any federally protected right or any deliberate indifference towards her because of her disability. Therefore, summary judgment will be entered in favor of Defendant.[1]

V.     *Conclusion*

Evidence does not support Plaintiff's claims against Defendant, and no genuine issue of material fact exists. Therefore, Defendant's Motion for Summary Judgment (Doc. No. 30) will be granted and Plaintiff's Motion for Summary Judgment (Doc. No. 28) will be denied.

An appropriate Order follows.

s/ Arthur J. Schwab
Arthur J. Schwab
United States District Judge

cc:     All Registered ECF Counsel and Parties

---

[1] Because Plaintiff has failed to demonstrate the School District's liability, the Court need not address the School District's arguments related to causation. The Court also necessarily finds that Plaintiff is not entitled to declaratory or injunctive relief.